# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

FROEDTERT HEALTH, INC.,
FROEDTERT MEMORIAL LUTHERAN
HOSPITAL, INC., FROEDTERT & THE
MEDICAL COLLEGE OF WISCONSIN
COMMUNITY PHYSICIANS, INC.,
COMMUNITY MEMORIAL HOSPITAL
OF MENOMONEE FALLS, INC., ST.
JOSEPH'S COMMUNITY HOSPITAL OF
WEST BEND, INC., FROEDTERT
SURGERY CENTER, LLC, DREXEL
TOWN SQUARE SURGERY CENTER,
LLC, INCEPTION HEALTH SERVICES,
LLC, WEST BEND SURGERY CENTER,
LLC,

        Plaintiffs,

    v.

FACTORY MUTUAL INSURANCE
COMPANY,

        Defendant.

Case No.:

Jury Demanded

---

## COMPLAINT

---

Plaintiff Froedtert Health, Inc. ("Froedtert Health"), and its associated entities Froedtert Memorial Lutheran Hospital, Inc. (d/b/a "Froedtert Hospital"); Froedtert & The Medical College of Wisconsin Community Physicians, Inc. ("F&MCW"); Community Memorial Hospital of Menomonee Falls, Inc. (d/b/a "Froedtert Menomonee Falls Hospital"); St. Joseph's Community Hospital of West Bend, Inc. (d/b/a "Froedtert West Bend Hospital"); Froedtert Surgery Center, LLC ("Froedtert Surgery"); Drexel Town Square Surgery Center, LLC ("Drexel Surgery");

Inception Health Services, LLC ("Inception Health"); and West Bend Surgery Center, LLC ("West Bend Surgery") (collectively, "Froedtert" or "Plaintiffs"), by and through its attorneys, files this Complaint against Defendant Factory Mutual Insurance Company ("Factory Mutual" or "Defendant"), and in support thereof alleges the following:

## NATURE OF THE ACTION

1.     This is a case about how inexcusable government negligence unleased a pandemic on the world, which made its way to Wisconsin and caused physical loss and damage to Plaintiffs' healthcare facilities.

2.     The spread of the coronavirus ("SARS-CoV-2") has caused unimaginable devastation to Wisconsin lives, property, and businesses. But the pandemic could have been contained. Despite years of preparation, extensive experience with prior similar infectious disease outbreaks, and armies of highly educated and trained public health professionals, the governments of The People's Republic of China ("China") and the United States of America (the "U.S.") failed to take necessary measures to contain SARS-CoV-2.

3.     This gross negligence resulted in the unprecedented spread of SARS-CoV-2 – a highly infectious communicable disease.

4.     When SARS-CoV-2 reached Wisconsin, Froedtert was forced to cease normal operations and adapt to the challenges of the pandemic.

5.     As a healthcare provider, Froedtert was on the front lines of the fight against SARS-CoV-2. Unlike other businesses, Plaintiffs were not in a position to close their doors to the public in order to halt the loss of and damage to their property. Instead, Froedtert properties were in constant danger of re-infiltration every time a patient or employee entered the premises because all people, symptomatic or not, could – and in some instances did – infect the air or surfaces with

SARS-CoV-2. Despite Plaintiffs' best efforts to contain the communicable disease, it spread throughout the facilities both by respiratory droplets in the air and by clinging to and persisting on surfaces by physically changing the affected property and rendering it dangerous and unusable.

6. The Governor of Wisconsin recognized that the Wisconsin hospital system was "on the brink of an unsustainable strain," forcing hospitals, like Plaintiffs' facilities, to reallocate resources from medical-surgical, intensive care, and other services to patients infected with SARS-CoV-2. Froedtert was in the same predicament. To protect its patients and staff, Froedtert had no choice but to cease regular business operations and incur extra expenses to respond to SARS-CoV-2. Froedtert was put to enormous cost to protect employees and protect and care for patients, which of course is its unchanging primary mission.

7. Froedtert prudently purchased "all risk" business interruption insurance for precisely this kind of casualty – loss or damage resulting from the presence of a communicable disease and resulting from others' negligence. Froedtert's Factory Mutual policy expressly defines "communicable disease actually present" as a "physical loss or damage," but Factory Mutual has refused to pay Plaintiffs' claims for more than a year, some without any significant investigation, leaving Froedtert to fend for itself.

8. Plaintiffs have suffered significant losses as a result of the presence of SARS-CoV-2, government negligence that failed to prevent the spread of the communicable disease, and civil orders aimed at containing the pandemic. Froedtert has dutifully paid its premiums to have a safety net of disaster insurance for precisely the kind of calamity that has happened, and Factory Mutual must honor its promises.

**PARTIES**

9. Plaintiff Froedtert Health is the parent entity of a healthcare network headquartered in Milwaukee, Wisconsin and incorporated in Wisconsin as a nonstock corporation. Froedtert

Health operates and/or has an ownership interest in a network of hospitals and medical facilities in Wisconsin.

10.     Plaintiff Froedtert Hospital is an obligated group member of Froedtert Health, which is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in Milwaukee, Wisconsin.

11.     Plaintiff F&MCW is a nonstock corporation incorporated in Wisconsin and has its principal place of business in Milwaukee, Wisconsin.  It is partially owned by Froedtert Health.

12.     Plaintiff Froedtert Menomonee Falls Hospital is an obligated group member of Froedtert Health.  It is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in Menomonee Falls, Wisconsin.

13.     Plaintiff Froedtert West Bend Hospital is an obligated group member of Froedtert Health.  It is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in West Bend, Wisconsin.

14.     Plaintiff Froedtert Surgery is a limited liability company, organized under Wisconsin law, owned by two members, one of which is Froedtert Health ASC Enterprise, LLC, organized under Wisconsin law, whose sole member is Froedtert Health, and the other of which is The Medical College of Wisconsin, Inc., which is incorporated in Wisconsin.  Froedtert Surgery has its principal place of business in Milwaukee, Wisconsin.

15.     Plaintiff Drexel Surgery is a limited liability company, organized under Wisconsin law, owned by two members, one of which is Froedtert Health ASC Enterprise, LLC, organized under Wisconsin law, whose sole member is Froedtert Health, and the other of which is The Medical College of Wisconsin, Inc., which is incorporated in Wisconsin.  Drexel Surgery has its principal place of business in Oak Creek, Wisconsin.

16.     Plaintiff Inception Health is a limited liability company whose sole member is Froedtert Health.  It is a limited liability company organized in Wisconsin and has its principal place of business in Menomonee Falls, Wisconsin.

17.     Plaintiff West Bend Surgery is a limited liability company, the sole member of which is Froedtert Health ASC Enterprise, LLC, whose sole member is Froedtert Health.  It is a limited liability company organized in Wisconsin and has its principal place of business in West Bend, Wisconsin.

18.     Defendant Factory Mutual Insurance Company is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Johnston, Rhode Island.  At all times relevant hereto, Factory Mutual was licensed to do business, and was doing and transacting business, in the State of Wisconsin.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are diverse in citizenship, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Factory Mutual does business in Wisconsin and is an authorized property and casualty insurer in Wisconsin.

## FACTUAL BACKGROUND

I.     **The Policy**

21.     To protect its property and business income interests, Froedtert purchased an "all risks" property policy (the "Policy") from Factual Mutual bearing policy number 1056478 and

covering the policy period of July 1, 2019 through July 1, 2020. The Policy is attached hereto as **Exhibit A**.

22.     The Policy specifies that the "Named Insured" includes Froedtert Health, as well as "any subsidiary, and Froedtert Health, Inc.'s interest in any partnership or joint venture in which Froedtert Health, Inc. has management control or ownership as now constituted or hereafter is acquired."

23.     In exchange for substantial premiums, the Policy broadly provides coverage "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded."

24.     The Policy contains a limit of liability of $2,000,000,000 per occurrence, subject to a $500,000 deductible. There are also varying sublimits for certain coverage sections.

25.     The Policy includes a separate coverage grant for Time Element loss "directly resulting from physical loss or damage of the type insured." In this coverage part, Factory Mutual also promised Extra Expense coverage for "the reasonable and necessary extra costs incurred by the Insured … to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business."

26.     In addition to the main property damage and time element coverage for "all risks of physical loss or damage" to Plaintiffs' properties, the Policy also provides an additional coverage for Communicable Disease Response, including cleanup costs and public relations benefits. The Policy prefaces all of the additional coverages with the following language: "This Policy includes the following Additional Coverages <u>for insured physical loss or damage</u>." Then, under Communicable Disease Response, it identifies as one such instance of physical loss or damage the circumstance in which "a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease**."

27. The Policy also contains several additional Time Element Coverage Extensions, including the following:

    a. Contingent Time Element for "Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy";

    b. Civil or Military Authority for "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location**";

    c. Ingress/Egress for "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured";

    d. Logistics Extra Cost for extra costs "due to the disruption of the **normal** movement of goods or materials"; and

    e. Interruption by Communicable Disease "[i]f a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and

access to such **location** is limited, restricted or prohibited by" government order or a decision of an Officer of the Insured.

28.     Also in the "Other Additional Coverages" section, the Policy explicitly covers Expediting Costs defined as the reasonable and necessary costs incurred "for the temporary repair of insured physical damage to insured property" or "for the temporary replacement of insured equipment suffering insured physical damage."

29.     The events surrounding the pandemic have triggered multiple coverage sections under the Policy including but not limited to the above-referenced policy provisions.

## II.     The Pandemic and the Effects of SARS-CoV-2

### A.  History of the Pandemic and Government Negligence

30.     A full history of the government conduct that led to the pandemic is attached hereto as **Exhibit B** and is incorporated fully herein.

#### i.     *China Unleashes SARS-CoV-2 on the World*

31.     On November 17, 2019, a 55-year-old from Hubei province became ill from exposure to a previously unknown virus that strongly resembled the SARS-CoV virus, which broke out in China in 2003 and wreaked havoc across the globe.  Similar cases began to be reported in China at that time at a rate of 1 to 5 each day, with 9 reported in November and 27 reported by December 15.  Then, cases began to rise by double-digits, with 60 reported by December 20, and 180 by December 27.  By December 31, there were 266 confirmed cases, and, one day later, on January 1, 2020, the number rose to 381.

32.     Although the Chinese government was reluctant to acknowledge the growing number of patients presenting SARS-like symptoms, by December 30, Chinese public health authorities were aware of the nature and significance of the outbreak.  The Wuhan Municipal Health Commission issued an emergency notice to the city's medical institutions that a series of

patients from the Huanan Seafood Wholesale Market had an "unknown pneumonia." The notice came with a warning: "Any organizations or individuals are not allowed to release treatment information to the public without authorization."

33.     On December 27, 2019, a Guangzhou-based genomics company, Vision Medicals, had sequenced most of the virus from fluid samples from the lung of a 65-year old deliveryman who worked at the Huanan Seafood Wholesale Market. The patient was admitted to the Wuhan Central Hospital on December 18 with pneumonia, and samples were taken from the fluid in his chest on December 24. The results showed an alarming similarity to the 2003 SARS-CoV coronavirus. Just a few days later, on January 1, 2020, gene-sequencing companies received an order from Hubei's health commission to stop testing and destroy all samples, according to an employee at one of the companies. Around the same time, several doctors posting test samples on social media were reprimanded for "spreading rumors online" and "severely disrupting social order."

34.     While silencing doctors and genomics companies, the Chinese government also spread misinformation, denying infections or deaths related to the illness. The Chinese government also claimed that "the risk of continued human-to-human transmission is low."

35.     Setting up the biggest "super spreader" event in human history, on January 18, 2020, Wuhan authorities allowed a traditional "pot luck" event celebrating the Lunar New Year to take place. The event involved 40,000 families from Hubei's Baibuting community, which covers an area of 4 square kilometers gathering in close quarters to share home-cooked food. Wuhan mayor Zhou Xianwang said in a television interview that the annual event was given the green light despite the risks involved, as the decision was made "based on the judgment that human-to-human transmission was limited".

36.     It was not until January 20, 2020, that Chinese authorities admitted that the new coronavirus was being spread by human-to-human transmission.  In China, it is a strong tradition for people to travel during the Lunar New Year.  Many who are working in cities go home to see relatives.  Many travel internationally.  Between January 20 and 23 – with no travel screening measures in place – 5 million people left Wuhan to travel around China and the world.

37.     On January 23, too late, China locked down the 11 million residents of Wuhan, indicating uncontrolled community spread due to China's failure to contain SARS-CoV-2.

    ii.     *The U.S. Negligently, and Catastrophically, Failed to Contain SARS-CoV-2*

38.     The U.S. government spent decades preparing for this pandemic.  In 2003 when a coronavirus first arose in China, it was contained largely through traditional public health interventions, such as finding and isolating case-patients, finding and quarantining close contacts ("contact tracing"), and enhanced infection control.

39.     In January 2004, the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention ("CDC") published a guidance document, entitled: "Key Measures for SARS Preparedness and Response."   The CDC warned that rapid and decisive action in response to a recurrence of SARS-CoV transmission requires local, state, and federal public health authorities to work efficiently and in concert toward the common goal of containing the spread of infection.

40.     During their presidencies, George W. Bush and Barack Obama also prepared reports and guidelines establishing best practices for responding to a pandemic, recommending among other things: (a) voluntary home isolation of the ill and home quarantine of the exposed; (b) dismissal of students from schools; (c) social distancing measures such as telework; (d) cancellation of large public gatherings; and (e) widespread use of personal protective devices.

41.     When SARS-CoV-2 emerged and it was time to put the plans into action, the U.S. government was marred with dysfunction.  Despite ample warning of the virus spreading in China, the U.S. failed – for two months – to develop and widely distribute an approved test so that hospitals and public health officials could track the virus's entry into the U.S. and apply containment protocols.  Bureaucratic red tape became a fatal obstacle to disseminating testing kits because, under U.S. law and regulations, no test could be used beyond the location where it is created without FDA approval.  This means that the most basic methods for combatting a pandemic – testing and containment – could not be done.

42.     FDA approval came on February 4, 2020, when the CDC's test kits were approved for distribution to state and local public health labs nationwide.  Almost immediately, the state and local labs discovered that the CDC test did not work.  It delivered inconclusive results and false positives, including diagnosing the presence of SARS-CoV-2 in distilled water.

43.     By February 9, the CDC was aware of the problem, but was in no hurry to fix it. On February 27, CDC Director Robert Redfield testified to the House Foreign Affairs subcommittee on Asia, stating that the "CDC believes that the immediate risk of this new virus to the American public is low."  Several months into the pandemic, the U.S. could not even diagnose — let alone contain — the spread of SARS-CoV-2.

44.     On January 18, the Department of Health and Human Services Secretary Alex Azar called President Trump to brief him on the SARS-CoV-2 outbreak.  President Trump was in the middle of his first impeachment trial, distracted from governing, and interrupted Mr. Azar to talk about a failed federal effort to ban vaping.  Azar's briefing did not cause President Trump any concern.

45.     On January 22, President Trump made his first public remarks, saying, "[W]e have it totally under control.  It's one person coming in from China. . . . It's going to be just fine."

46.     Around this time, the White House scrambled together an ad hoc Coronavirus Task Force, having disbanded the designated body – the National Security Council Preparedness Office ("NSC Preparedness Office") – in 2018.  Established in 2015 after lessons learned from U.S. efforts to control the Ebola outbreak in West Africa, the NSC Preparedness Office was "dedicated exclusively to be the smoke alarm to warn of the first sign of a fire before it becomes a blaze," according to a former head of the office under the Obama Administration.  It was designed to feed expertise and recommendations directly to key decision makers at the NSC level in the event of a global health crisis, when speed is essential.

47.     On January 31, the day the U.S. declared a Nation Public Health Emergency, Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, who was serving on the Coronavirus Task Force, noted to reporters that at the beginning of the outbreak, it was not clear whether an infected person without symptoms could transmit the virus to another person.  He clarified, "Now we know for sure that there are [asymptomatic infections]."  On the same day, Azar, now Chair of the Coronavirus Task Force, said the risk to the American public was "low."

48.     During the rest of February, President Trump and other top White House officials appeared to have no appreciation that the coronavirus was spreading to the U.S. and becoming a pandemic.  Having signed a trade agreement with China in January, President Trump continued at this point to praise President Xi.

49.     On February 7, President Trump tweeted: "Just had a long and very good conversation by phone with President Xi of China. He is strong, sharp and powerfully focused on

leading the counterattack on the coronavirus. He feels they are doing very well, even building hospitals in a matter of only days. Nothing is easy, but......he will be successful, especially as the weather starts to warm & the virus hopefully becomes weaker, and then gone. Great discipline is taking place in China, as President Xi strongly leads what will be a very successful operation. We are working closely with China to help!"

50.    President Trump continued to downplay the expanding outbreak throughout February, insisting that "[i]t's going to disappear" and that it was no worse than "the common flu."

51.    Then, on March 11, the World Health Organization ("WHO") declared a pandemic.

52.    The next day, Fauci testified to Congress about the lack of adequate testing. "The system does not - is not - really geared to what we need right now," he said. "Yes, it is a failure, let's admit it."

53.    On March 13, President Trump declared a National Emergency. At the time, there were over 1,700 confirmed cases and 40 confirmed deaths in the U.S.

54.    At this point, it was far too late in the U.S. to contain SARS-CoV-2 by testing, contact tracing, and isolating – as was successfully done in South Korea and elsewhere. The virus had been spreading in the U.S. for at least a month and had reached "community spread" – a point where the origin of infections could no longer be identified, and it was no longer possible to contain the virus except by enforcing social distancing by shutting down the U.S. economy and ordering citizens to stay home except for essential activities.

55.    Around this time, on March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72, declaring a public health emergency.

56.    Less than two weeks later, on March 25, 2020, Governor Evers issued Emergency Order # 12, known as the "Safer At Home" Order, directing people not to leave their homes unless

necessary. The Order notes that within the last 72 hours "COVID-19 cases have risen in the United States from 15,219 to 33,404 (119% increase) and have risen in Wisconsin from 206 to 416 (102% increase)." The exponential growth rate of COVID-19 cases meant that "the number of people needing medical care due to COVID-19 will significantly exceed the amount of available healthcare resources."

57.     But the social distancing measures did not last. On May 13, 2020, the Wisconsin Supreme Court blocked the "Safer At Home" extension and reopened the state. With no protocol in place, Wisconsin became a "hot spot" with thousands of confirmed cases being reported each day.

58.     With community spread in full swing, Plaintiffs' properties were overrun with patients and staff members carrying SARS-CoV-2, necessitating extraordinary costs to protect patients and employees and a massive redirection of the use of Plaintiffs' facilities to combat SARS-CoV-2.

**B.  SARS-CoV-2 Causes Physical Loss of and Damage to Property**

59.     The scientific community has confirmed that SARS-CoV-2 virions and COVID-19 alter the conditions of properties, in that the premises are physically damaged and no longer safe for normal use. In this regard, SARS-CoV-2 virions and COVID-19 cause physical loss of and damage to properties.

60.     This physical loss and damage to property results because SARS-CoV-2 virions have a corporeal existence and are contained in respiratory droplets. Once expelled from infected individuals, these droplets adhere to surfaces and objects and physically change these once safe surfaces into "fomites." Fomites are objects, previously safe to touch, that now serve as a vehicle for transmissions of SARS-CoV-2 virions. Fomites physically change the air, airspaces, property, and property surfaces by becoming a part of the air or property. This physical change makes

- 14 -

contact with affected surfaces unsafe and potentially deadly. In turn, the physical change of the affected surface or material causes tangible and severe property loss and damage. The properties are unusable, dangerous, and cannot be used unless and until the COVID-19-related conditions are fully rectified.

61.     Medical and scientific research also has established that SARS-CoV-2 virions and COVID-19 spread through indoor airborne transmission. When individuals carrying SARS-CoV-2 virions breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air, accumulate in buildings, and – like dangerous fumes – make the premises unsafe and unusable.

62.     Airborne particles likewise are known to have spread into a facility's heating and ventilation ("HVAC") system, leading to transmission of SARS-CoV-2 virions from person to person. The Environmental Protection Agency ("EPA") has recommended that facilities make improvements to their ventilation and HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.

63.     Fomites, droplets, droplet nuclei, and aerosols containing SARS-CoV-2 virions are not theoretical, informational, or incorporeal, but rather are dangerous physical objects that have a tangible existence. Their presence within an insured property causes physical loss of and damage to property by necessitating remedial measures that include, without limitation, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, removal of fomites by certified technicians, and other measures.

64.     The presence of SARS-CoV-2 virions on property also creates the imminent threat of further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the property by touching a doorknob or a

handrail will carry those droplets on their hands and deposit them elsewhere in the property, causing additional damage and loss.

65.    There have been thousands of confirmed cases of COVID-19 at Froedtert's properties.  Staff and patients tested positive for the communicable disease and SARS-CoV-2 virions spread throughout the healthcare facilities, necessitating expensive daily cleaning to protect patients and staff.  Without the constant remediation of the premises, Froedtert's facilities could not be used as hospitals and clinics as doing so would place patients and staff at unacceptable risk of infection.   Additionally, the sheer number of confirmed cases in Wisconsin, which is conservatively estimated at 675,000 people, indicates that community spread certainly reached Froedtert.

66.    The presence of SARS-CoV-2 at Froedtert's hospitals and clinics is particularly dangerous in view of the fact that many patients have compromised immune systems or other factors that make them susceptible to the worst effects of contracting COVID-19.  In addition, as front line healthcare facilities, Froedtert had to keep its facilities open and accept patients with COVID-19 to enter those facilities every day.  This necessitated daily and extraordinary efforts to clean and disinfect its property.

67.    Froedtert has spent millions of dollars in a constant, never-ending effort to disinfect and remediate its properties throughout the pandemic to protect patients and staff.

III.    **The Pandemic, Government Negligence, and Civil Authority Orders Caused Plaintiffs' Losses**

68.    Froedtert consists of a network of hospitals, emergency care, inpatient facilities, surgery facilities, and other medical centers that provide care to countless patients every year.  As healthcare providers, Plaintiffs' properties are visited on a daily basis by thousands of people, who require person-to-person contact in order to administer medical care.

- 16 -

69.     Plaintiffs have suffered as a result of the government's negligence in preventing the spread of SARS-CoV-2, the presence of SARS-CoV-2 at its properties, and the civil authority orders issued in response.  Indeed, the nation's healthcare system generally has suffered during the pandemic. At least 47 hospitals in the U.S. closed or entered bankruptcy as of October 2020, as "lower patient volumes, canceled elective procedures and higher expenses tied to the pandemic have created" significant obstacles for healthcare providers.[1]

70.     Governor Evers has acknowledged the strain placed on Wisconsin's healthcare system in particular.  In January 2021, he issued Emergency Order # 1, which declared that the Wisconsin "hospital system is on the brink of an unsustainable strain," with more than a third of hospitals operating at peak capacity.  As a result, many healthcare providers – like Froedtert – have been forced to reallocate their resources. Statewide, according to the Emergency Order "twenty-one percent of medical-surgical beds and thirty-two percent of intensive care unit beds are occupied by COVID-19 patients.  With the large and growing influx of COVID-19 patients, there are fewer beds and resources available for people with non-COVID-19 conditions that require hospitalization."

71.      Froedtert was in the same predicament.  To protect its patients and staff, Froedtert had no choice but to cease regular business operations and incur extra expenses in order to respond to government negligence and the presence of SARS-CoV-2 at its properties.

72.     By September 30, 2020, Froedtert Hospital had dedicated resources to approximately 1,010 patients who tested positive for COVID-19.  As of that same date, Froedtert

---

[1] Ayla Ellison, *47 hospitals closed, filed for bankruptcy this year*, Beckers Hospital CRO Report (Oct. 16, 2020), https://www.beckershospitalreview.com/finance/47-hospitals-closed-filed-for-bankruptcy-this-year.html.

Menomonee Falls Hospital had treated 304 COVID-19 patients and Froedtert West Bend Hospital had treated 111 COVID-19 patients.

73.     The sudden influx of COVID-19 patients brought with it a change in treatment protocols.  Because SARS-CoV-2 is a highly infectious communicable disease, Froedtert spent millions on personal protective equipment, safety equipment, employee and patient screening equipment, IT equipment supporting telehealth, waste disposal equipment, cleaning/sanitization supplies, and other equipment and supplies to prevent its spread among staff and patients.  All providers in emergency rooms and urgent care facilities were instructed to wear eye protection, face masks, gowns, and gloves when examining any patient with shortness of breath or coughs.

74.     Because SARS-CoV-2 spreads from person to person via surfaces of property in its facilities, the protective effort had to include both protection against direct transmission through the air and indirect transmission via surfaces.  Froedtert was forced to modify its janitorial services, patient check in procedures, and even the layout of its emergency room in order to ensure frequent cleanings and social distancing.  At the same time, Froedtert established COVID-19 screening and testing areas, expended resources to prepare for a coronavirus surge, rented a tent for staging, established testing facilities, and made other equipment, construction, and supplies purchases to respond to the pandemic.

75.     At Plaintiffs' facilities, the redirection of resources resulted in over $75 million in Business Income Loss from March to September 2020.  As of June 2020, Froedtert incurred over $10 million in Extra Expenses.

76.     In addition to moving and reallocating property, Froedtert also was forced to reorganized and reallocate its staff.  Because SARS-CoV-2 is a highly infectious communicable disease, despite Froedtert's herculean efforts to prevent its spread, some staff did test positive or

exhibit symptoms of COVID-19. As a result, Froedtert implemented new "COVID-19" classifications in its timekeeping system to track hourly wages paid to staff who were personally impacted by COVID-19 including testing positive for the virus, serving quarantine time due to exposure to the virus, and tending to family during the pandemic. In addition, to ensure the facilities had enough staff during COVID-19 surges, Froedtert implemented incentives for its staff such as wages for being available even if they do not work, special "retainer" bonuses, and paying wages for "non-productive" time. Some hourly employees were reallocated from their typical job to assist with COVID-19 related tasks, such as patient screening, stocking of COVID-19 supplies, sanitizing, and other tasks. The labor costs at Froedtert Hospital alone exceeded $1 million.

77.     On March 17, 2020, in an effort to comply with the CDC's guidance on social distancing, all elective surgeries and procedures were deferred at Froedtert facilities, provided that a delay did not put the patient at risk. This, too, resulted in significant business interruption losses, as elective procedures are a substantial source of income for Froedtert's facilities.

78.     In sum, Froedtert's losses and expenses total in excess of $85 million and continue to grow.

## IV.   The Policy Covers Plaintiffs' Losses

79.     The Policy provides coverage to Froedtert and its associated entities for all risks of physical loss or damage.

80.     Plaintiffs have sustained actual losses and incurred extra expense as a result of the presence of SARS-CoV-2, government negligence in failing to prevent the spread of SARS-CoV-2, and related government orders limiting and/or restricting Froedtert's operations.

81.     Froedtert gave timely notice of its losses and damages under the Policy.

82.     Factory Mutual initially agreed that there was coverage under the Policy's Communicable Disease Response coverage sections, but ultimately refused to pay even the

$1 million limit under this additional coverage before the Parties' tolling agreement expired and Froedtert was forced to bring suit. Factory Mutual has otherwise denied any further obligations under the Policy, even though there are several other coverage provisions that apply to Plaintiffs' claim.

### A. The Policy Covers "All Risks"

83.     The Policy affords coverage for "all risks" of physical loss of or damage to Plaintiffs' property.

84.     The actual presence of SARS-CoV-2 at Froedtert facilities has resulted in the physical loss of the property and tangible damage to the property, thereby triggering the Policy's coverage.

### B. Time Element Coverage

85.     The Policy affords coverage for Plaintiffs' Time Element losses, subject to the Policy's terms and conditions.

86.     The actual presence of SARS-CoV-2 at the insured properties and government negligence in failing to contain the pandemic have caused Plaintiffs to suffer Time Element loss as a direct result of physical loss and damage of the type insured under the Policy.

### C. Extra Expense

87.     The actual presence of SARS-CoV-2 at the insured properties and government negligence in failing to contain the pandemic have caused Plaintiffs to incur reasonable and necessary expenses to maintain its operations.

88.     The expenses incurred by Plaintiffs are beyond those that would have normally been incurred in conducting its business absent the covered occurrence.

### D. Civil Authority Coverage

89.     The Governor of Wisconsin and other governing organizations issued several orders of civil authority that partially limited Plaintiffs' access to its property.

90.     For example, the March 25, 2020 "Safer At Home" order kept patients at home and limited their access to Froedtert for care, especially for elective procedures.

91.     Such orders were the direct result of the actual presence of SARS-CoV-2 at the insured properties and government negligence in failing to contain the pandemic, both of which caused physical damage of the type insured and resulted in the issuance of the orders of civil authority.

### E. Communicable Disease Response Additional Coverage

92.     Factory Mutual acknowledged that the actual presence of SARS-CoV-2 at Plaintiffs' properties triggered coverage under the Communicable Disease Response and Interruption By Communicable Disease subsections of the Policy.

93.     The availability of coverage under the Communicable Disease subsections of the Policy does not limit recovery under other applicable coverage provisions.

94.     Additionally, the sublimits for Communicable Disease coverage do not apply to limit any other coverage under the Policy.  Such coverage provisions are subject to the designated sublimits and/or the Policy's sublimit of $2,000,000,000 per occurrence. Indeed, the Policy specifically provides that "[l]imits of liability apply per **occurrence**, unless otherwise stated."

### F. Plaintiffs' Losses Are Covered Under Any and All Other Applicable Policy Provisions

95.     In addition to the damages, losses and/or coverages described above, Plaintiffs' COVID-19 losses are covered under any and all other coverages under the Policy that apply.

## G. No Policy Exclusion Precludes or Limits Coverage for Plaintiffs' Losses

96.     The Policy does not contain any exclusions that apply to preclude or limit coverage for Plaintiffs' losses and damages.

97.     Notwithstanding Factory Mutual's arguments to the contrary, the Contamination Exclusion, as used in the Policy, does not apply to communicable diseases such as SARS-CoV-2.

98.     The Policy's Contamination Exclusion states that "**contamination**, and any cost due to contamination" is excluded "unless directly resulting from other physical damage not excluded by this Policy…"

99.     The Policy's definition of "contamination" includes general references to "pathogen or pathogenic organism," "virus," or "disease causing or illness causing agent," but does not include "communicable disease" which is defined elsewhere as a "disease which is … transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."  Factory Mutual has acknowledged that SARS-CoV-2 is a communicable disease.

100.    As a result, the Policy's Contamination Exclusion does not apply to Plaintiffs' claim for several reasons.

101.    First, excluding coverage in this instance would conflict with the Policy's affirmative coverage grant for physical loss or damage defined by the Policy to include the actual not suspected presence of a communicable disease at Plaintiffs' facilities.  The Policy explicitly provides coverage for the actual not suspected presence of a communicable disease, and SARS-CoV-2 is a communicable disease because it can be transmitted from person to person.  Because the physical damage to Plaintiffs' property has been caused by a communicable disease – which is "not excluded by this Policy" – the Contamination Exclusion does not apply.  If it did, the additional coverage for Communicable Disease Response would be illusory.

102.     Second, the Contamination Exclusion excludes only "*costs* resulting from contamination," and does not purport to exclude "losses" or "damages" resulting from contamination. As the Policy covers "all risks of physical loss or damage" to Plaintiffs' property, including time element losses, Factory Mutual could have referred to loss or damage in the Contamination Exclusion if it intended to exclude all coverage resulting from contamination. It did not do so. Thus, the Contamination Exclusion is expressly directed solely to any costs incurred to remove a contaminant, but does not encompass time element losses, including extra expense coverage.

103.     Third, there is an existing standard-form "virus exclusion" that Factory Mutual did not adopt. In 2006, the Insurance Service Office published and circulated a virus exclusion, which states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Rather than using this explicit virus exclusion, Factory Mutual instead adopted the less restrictive Contamination Exclusion, which does not specify that a viral communicable disease is also excluded. On the contrary, Factory Mutual defines physical loss or damage to include the actual presence of a communicable disease and provides additional benefits beyond the main coverage for certain response costs, such as cleanup and public relations costs.

104.     Fifth, even if the Contamination Exclusion applied, a clearly covered cause is responsible for setting in motion the pandemic – government negligence. Under the concurrent causation doctrine, if the motivating cause of loss is a covered (i.e. not excluded) cause, then the existence of an excluded cause in the chain of causation does not affect coverage.

105.     For all of these reasons, the Contamination Exclusion does not apply to restrict coverage for Froedtert's losses from the pandemic.

## V.     <u>Bad Faith Denial of Coverage</u>

106.     Factory Mutual has failed to pursue a diligent, fair, or objective investigation of Froedtert's claim, and instead has fixated on ways to limit coverage based on knowing misrepresentations of the law and the terms of its Policy.

107.     Factory Mutual's conduct with respect to Plaintiffs is consistent with and part of an orchestrated campaign that Factory Mutual has engaged in throughout the country.  Specifically, Factory Mutual has been engaged in a systematic scheme of misrepresenting policy terms and making burdensome information requests to Factory Mutual policyholders, including Froedtert, with the objective of dissuading them from pursuing covered insurance claims, regardless of the actual merits of those claims.

108.     When Froedtert submitted its claim, Factory Mutual had already issued guidelines to all of its claims handlers instructing adjusters to uniformly deny coverage for all COVID-19 claims. These guidelines were issued in the form of "Talking Points," which instruct claims handlers to ignore the individual facts of each case, and instead limit coverage to the Communicable Disease sublimits under the Policy. The Talking Points are attached hereto as **Exhibit C**.

109.     Factory Mutual drafted the Talking Points and instructed its personnel to use the Talking Points when adjusting all claims based on COVID-19, rather than adopting reasonable standards for investigation of such claims to ascertain whether they should have been paid.

110.     The Talking Points outline only a few of the many different coverages contained in Factory Mutual's standard commercial property policies, including policies of the type Factory Mutual sold to Froedtert, that specifically afford coverage for COVID-19 claims.

111.     The Talking Points outline certain specific "triggers" of coverage that the adjuster should look for when investigating any COVID-19 claim.  Notably, the only "triggers" identified are those applicable to the Communicable Disease additional coverages.

112.     The Talking Points fail to include all of the different "triggers" of coverage that may be implicated by COVID-19 claims.  Instead, the Talking Points expressly deny the existence of coverage under the Policy's Civil or Military Authority coverage, Time Element coverage, and other coverage sections.

113.     The Talking Points direct the claims adjuster to reach conclusions without considering the specific facts of the particular claim and without considering the applicable law that governs interpretation of the relevant insurance policy.

114.     Factory Mutual, through its adjusters, relied on the Talking Points while assessing Froedtert's claim.

115.     Factory Mutual followed the instructions of the Talking Points and denied coverage beyond the Communicable Disease coverages without reasonably considering the facts of Froedtert's claim or the law controlling the interpretation of the Policy.  It then refused even to pay sublimits under the Communicable Disease Response and Time Element additional coverage, without a reasonable basis for doing so.

116.     Factory Mutual's failure to pursue an objective and reasonable investigation of Froedtert's claim was in reckless disregard of its obligation to ascertain whether there was a reasonable basis for denying Froedtert's claim based upon the facts specific to Froedtert.

117.     Froedtert has suffered damages as a result of Factory Mutual's bad faith conduct.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Declaratory Relief Against Factory Mutual)

118.    Froedtert repeats and realleges the allegations in paragraphs 1 to 117 as if fully set forth herein.

119.    Froedtert seeks a declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.

120.    A justiciable controversy exists between Froedtert and Factory Mutual concerning Factory Mutual's duty to indemnify Froedtert's claims for Property Damage losses, Time Element losses, and other losses, costs, and expenses under the Policy.

121.    The controversy between Froedtert and Factory Mutual is ripe for review.

122.    Accordingly, Froedtert seeks a declaration from the Court that:

    i.   Each coverage provision identified herein is triggered by Froedtert's claim;

    ii.   No exclusion in the Policy applies to bar or limit coverage for Froedtert's claim;

    iii.   Froedtert has satisfied or is excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the Policy;

    iv.   The sublimits applicable to coverage under the Communicable Disease Response and Interruption By Communicable Disease subsections do not apply to limit Froedtert's recovery under other relevant sections of the Policy; and

    v.   Any other declaratory relief that would be useful to the resolution of the dispute between the parties.

## SECOND CAUSE OF ACTION
## (Breach of Contract Against Factory Mutual)

123.     Froedtert repeats and realleges the allegations in paragraphs 1 to 122 as if fully set forth herein.

124.     The Policy is a valid and enforceable contract between Froedtert and Factory Mutual.

125.     Froedtert has satisfied or is excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the Policy.

126.     Factory Mutual agreed in its Policy to provide insurance coverage for all risks of physical loss of or damage to property not otherwise excluded.

127.     Froedtert has suffered actual losses and incurred extra expense due to physical loss or damage with respect to its properties caused by the presence of SARS-CoV-2, government negligence that failed to prevent the spread of SARS-CoV-2, and civil orders issued in response to the pandemic – risks not excluded by Policy.

128.     No exclusion in the Policy applies to bar or limit coverage for Froedtert's claim.

129.     The Insurers are contractually obligated under the All Risks Policies to indemnify Froedtert for the full amount of its losses up to the Policy's $2,000,000,000 limit of liability, including any applicable sublimits.

130.     Factory Mutual unjustifiably refused to pay for Froedtert's losses, in breach of the Policy.

131.     As a direct and proximate result of its breach of contract, Factory Mutual has deprived Froedtert of the benefits of the insurance coverage for which substantial premiums were paid, which entitles Froedtert to money damages, including interest according to law.

132.    Froedtert's losses as a result of Factory Mutual's breach of contract are continuing, and Froedtert reserves the right to seek the full and exact amount of its damages at the time of trial.

### THIRD CAUSE OF ACTION
### (Bad Faith Denial of Coverage Against Factory Mutual)

133.    Froedtert repeats and realleges the allegations in paragraphs 1 to 132 as if fully set forth herein.

134.    Factory Mutual acted in bad faith by, among other things, failing to reasonably investigate Froedtert's claim and provide coverage for a claim that was not reasonably debatable under the relevant facts and Wisconsin law.

135.    In denying Froedtert's claim, Factory Mutual relied on inaccurate Talking Points, without regard for the plain language of the Policy or the facts of Froedtert's claim.

136.    Factory Mutual employed a systematic "one-size-fits-all" approach to adjusting and denying coverage for all COVID-19 claims, including Froedtert's claim, rather than adopting reasonable standards for investigation of claims.

137.    Factory Mutual failed to conduct a reasonable evaluation and investigation of Froedtert's claim and, therefore, Factory Mutual's denial of Froedtert's claim lacks any reasonable basis.

138.    Factory Mutual has previously judicially admitted that loss of functionality or reliability of a property is sufficient to constitute physical loss or damage under insurance policies, and that structural damage or alteration to a property is not required.  Therefore, Factory Mutual knew and recklessly disregarded that it had no reasonable basis to take the opposite position and deny coverage for Froedtert's claim.

139.    Factory Mutual knew, or recklessly failed to ascertain, that there was no reasonable basis to deny coverage for Froedtert's claim.

140.     As a result of Factory Mutual's bad faith, Froedtert has suffered and is continuing to suffer damages.

141.     Froedtert is entitled to an award of damages because of Factory Mutual's bad faith in an amount to be determined at trial, including compensatory damages, actual attorney's fees, pre- and post-judgment interest, punitive damages, and any other costs and relief that this Court deems appropriate.

## **PRAYER**

WHEREFORE, Plaintiffs respectfully request this Court to grant judgment in their favor and against Defendants for the relief requested in Counts I, II, and III above.

Plaintiffs demand a jury trial on all claims so triable.

Dated: June 9, 2021

By:  *s/ Susan E. Lovern*
Susan E. Lovern, SBN 1025632
Kelly J. Noyes, SBN 1064809
*Attorneys for Plaintiff Froedtert Health, Inc.  et al.*
**von BRIESEN & ROPER, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI  53202
Lovern Phone:  (414) 287-1286
Lovern Fax:  (414) 238-6599
Emails: slovern@vonbriesen.com
    knoyes@vonbriesen.com


By:  *s/ John Vishneski*
John S. Vishneski III
Nadia Abramson
*Attorneys for Plaintiff Froedtert Health, Inc. et al*
**REED SMITH LLP**
10 South Wacker Drive, 40th Floor
Chicago, IL        60606-7507
Phone:  (312) 207-2404
Fax:  (312) 207-6400
E-mails: jvishneski@reedsmith.com
    NAbramson@reedsmith.com

36484142_4.DOCX